IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 17-07489 (ESL) |
| JUAN J. GUALLINI INDIJ, AND RAQUEL MEDINA RAMPOLLA | CHAPTER 13 |
| Debtors | |
| JUAN J. GUALLINI INDIJ, AND RAQUEL MEDINA RAMPOLLA | |
| Plaintiff(s) | ADV. PROC. 19-00012 |
| vs. | |
| BANCO POPULAR DE PUERTO RICO, ET ALS. | |
| Defendant(s) | |

OPINION AND ORDER

On February 4, 2019 the debtors/plaintiffs initiated the instant action seeking "relief, in the form of an Order and/or Declaratory Judgment for a determination of avoidance, in full, or, in the alternative, the subordination of Defendant's Banco Popular de Puerto Rico ("BPPR") claims based on its inequitable conduct constituting Lender's Liability and actions taken by Defendant BPPR in prejudice of the Plaintiffs' during the years preceding the filing of the Chapter 13 proceeding, pursuant to Federal Rules of Bankruptcy Procedure 7001(8) and 7001(9). By this action, Plaintiffs seeks such relief based on Defendant BPPR's violations to Sections 2605(e)(1)(B)(2), 2605(e)(2)(C)(i), and 2605(f) of Title 12 of the United States Code, also referred to as the Real Estate Settlement Procedures Act (hereinafter referred to as "RESPA"), 12 U.S.C. §§ 2601-2617, and Sections 3500.21(e)(1) and 3500.21(e)(3) of Regulation X (hereinafter

-1-

referred to as "Regulation X"), 12 C.F.R. §§ 1024.1-1024.41, and the Truth-in-Lending Act (TILA) of 1968."

This adversary proceeding is before the court upon the motion for summary judgment filed by the defendant, BPPR, and the opposition and cross motion for summary judgment filed by the Debtors/Plaintiffs. BPPR alleges that the complaint should be dismissed due to the following: (i) any cause of action for an alleged tort pursuant to the Puerto Rico Civil Code Art. 1802, 31 L.P.R.A. §5141, including Plaintiffs' claims for BPPR's negligence, tortious interference and culpa in *contrahendo,* all which prescribe within a year. 31 L.P.R.A. §5298. Plaintiffs' claims are time-barred because all relevant events stated in the Complaint took place more than one year before filing the bankruptcy petition on December 27, 2017, and more than one year after Plaintiffs became aware of the foreclosure; (ii) Plaintiffs fail to state any claim upon which relief can be granted pursuant to RESPA, Regulation X, TILA or HAMP. Moreover, Plaintiffs' factual allegations and evidence produced do not support any relief under any of these federal laws/regulations. Thus, the Federal Regulations cause of actions should be summarily dismissed; (iii) the Rooker-Feldman doctrine precludes the Plaintiffs from bringing forth any cause of action in the bankruptcy court that should have been brought in the foreclosure proceedings which resulted in a State Court Judgment, Foreclosure Order and Attachment Order; and (iv) the complaint should be dismissed because the Plaintiffs' damages are speculative. (Docket No. 124).

Plaintiffs in their *Opposition to Defendant's Motion for Summary Judgment* argue that: (i) 11 U.S.C. §108(a) tolled the statute of limitations regarding all claims under article 1802 of the Puerto Rico Civil Code because Plaintiffs learned of BPPR's tortious interference with the purchaser under the option contract on or about March or April 2017; (ii) all violations under RESPA were timely filed because the statute of limitations for RESPA is three (3) years and the three (3) year period was tolled for (2) years pursuant to 11 U.S.C. §108(a); (iii) under the lender's liability count, actions for breach of contract are determined by Article 1864 of the PR Civil Code which provides a fifteen (15) year state of limitations. Under the facts of this case, a valid short

sale contract was unequivocally perfected between BPPR and the Plaintiffs on October 25, 2016; (iv) the calculation of damages is subject to bona fide dispute and is not ripe for adjudication because no formal discovery was undertaken by the parties on the experts consulted, disclosed and/or retained, and the parties did not reach discovery on the expert reports because the reference was withdrawn to the United States District Court for the District of Puerto Rico before the expiration of the experts' discovery deadline; and (v) the Rooker-Feldman doctrine is inapplicable to the facts of this case. The Plaintiffs in their *Cross Motion for Summary Judgment* contend that: (i) BPPR incurred in at least six (6) violations under Regulation X, 12 C.F.R. §1024.41(b) by not issuing the required written notifications to the Guallinis within five (5) days of receipt of their surrender offers in the amounts of the $130,000 offer; $150,000 offer; $154,000 offer; the $155,000 offer; and the $145,000 offer; (ii) BPPR incurred in at least five (5) violations under Regulation X, 12 C.F.R. §1024.41(g) by not stopping the foreclosure proceedings regarding the $130,000 offer; $150,000 offer; the $154,000 offer; the $155,000 offer and the $145,000 offer; (iii) BPPR did not stop the foreclosure proceedings upon the $170,000 offer and/or Defendant's counteroffer which fulfilled the loss mitigation procedures and created a binding contractual obligation to stop the foreclosure and pursue the short sale; (iv) during the loss mitigation process, BPPR, denied the Guallinis' application in violation of the due diligence provisions of 12 CFR §1024.41(b), because it did not take into account the employment letter dated September 6, 2016 informing the Guallinis' imminent loss of income; (v) BPPR did not propose to the Plaintiffs any qualifying property-retention alternatives in loss mitigation other than a short sale nor expressed that they were not being evaluated on other loss mitigation alternatives, therefore failing to comply with 12 CFR §1024.41(d); (vi) BPPR acted negligently by issuing a letter on October 25, 2016 to Plaintiffs indicating that the foreclosure would be avoided. The Guallinis subscribed an addendum to the contract containing the $170,000.00 offer with Mr. Merced Mora recognizing the final agreement with BPPR. However, on November 2, 2016, BPPR illegally foreclosed on the property and tortiously interfered with the contract between the Guallinis and Mr. Merced Mora in violation of the Addendum Contract, while it was in effect, resulting in the consummation

of the sale to Mr. Merced Mora in detriment to the contractual obligation with the Plaintiffs; (vii) Defendant continued collection efforts against Plaintiffs for the "deficiency" in the amount of $114,774.72, causing actual damages for such amount, and forcing Plaintiffs to incur in attorney's fees, expenses and costs against such predatory collection efforts and inequitable conduct. The interference with the contract was the proximate cause of Plaintiffs' injuries; and (viii) as a direct consequence of BPPR's breach of the short sale contract with Plaintiffs, the Guallinis suffered actual and emotional damages, loss of profits, pecuniary losses, and had to incur in significant attorney's fees, costs and expenses. Damages which are still subject to discovery proceedings. (Docket No. 146). BPPR filed an *Omnibus: (I) Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment; and (II) Opposition to Plaintiffs' Cross Motion for Summary Judgment* (Docket No. 167). The Plaintiffs filed a *Sur-reply to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment; and Sur-reply to Defendant's Opposition to Plaintiff's Cross Motion for Summary Judgment* (Docket No. 192).

Relevant Procedural Background

The adversary proceeding was filed on February 4, 2019 and assigned to bankruptcy judge Brian K. Tester. The complaint is predicated upon allegations based on violations of the following: (i) Sections 2605(e)(1)( B)(2), 2605(e)(2)(C)(i) and 2605(f) of Title 12 of the United States Code; also referred to as the Real Estate Settlement Procedures Act ("RESPA"); (ii) 12 U.S.C. §§2601-2617, and Section 3500.21(e)(1) and 3500.21(e)(3) of Regulation X; 12 C.F.R. §§1024.1- 1024.41; (iii) the Truth in Lending Act ("TILA"); (iv) BPPR's tortious interference under Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. §5141, with the contract between the Plaintiffs and Mr. Merced Mora in which BPPR removed Plaintiffs from the transaction and sold the property to Mr. Merced Mora directly; (v) BPPR's *culpa in contrahendo* conduct/actions after approving the short sale between Plaintiffs and Mr. Merced Mora and representing its interest in finalizing the short sale for the purpose of freeing Plaintiffs from the mortgage lien with BPPR, and avoiding the foreclosure process initiated by BPPR against Plaintiffs. Instead of

complying with the approved "short sale" transaction, without providing any type of notice or justification, BPPR withdrew in bad faith from the transaction, to continue the foreclosure process against Plaintiffs' property and adjudicated the property to itself one week after approving the short sale. Thereafter, BPPR removed the Plaintiffs from the transaction and finalized the sale of the property to Mr. Merced Mora. Plaintiffs relied on BPPR's representations for years and had the expectation of finalizing the transaction with the sole purpose of eliminating the lien and mortgage debt owed to BPPR; (vi) Defendant's actions caused Plaintiffs actual damages in no less than $114,774.72, the same amount BPPR attempted to collect as a "deficiency" directly resulting from the sale to Mr. Merced Mora after having removed Plaintiffs from the negotiations. Such bad faith actions by BPPR also caused actual, emotional, and statutory damages to Plaintiffs in an amount no less than $100,000. Moreover, BPPR's gross negligence and reckless management of Plaintiffs' financial affairs is a repetitive conduct deserving the imposition of punitive damages in an amount no less than $50,000. (Docket No. 1).

On March 7, 2019, BPPR filed a *Motion Requesting Extension of Thirty Days to Respond to the Verified Complaint* and the same was granted on March 8, 2019 (Docket Nos. 9 & 10). On April 8, 2019, BPPR filed a second *Motion Requesting Extension of Thirty Days to Respond to the Verified Complaint* and the same was granted on April 11, 2019. (Docket Nos. 12 & 13). On May 9, 2019, BPPR filed an *Amended Motion to Dismiss the Verified Complaint*. (Docket No. 22). On May 23, 2019, the Plaintiffs filed a *Motion for Extension of Time* and the same was granted on May 30, 2019. (Docket Nos. 25 & 26). On June 6, 2019, the Plaintiffs filed a second *Motion for an Extension of Time* to reply to the Motion to Dismiss. (Docket No. 30). On June 20, 2019, the Debtors/Plaintiffs filed their *Opposition to the Motion to Dismiss* (Docket No. 31). On July 15, 2019, BPPR filed a *Motion for Leave to file Reply to Opposition to Motion to Dismiss the Verified Complaint (Docket No. 31)* and the same was granted on July 19, 2019 (Docket Nos. 38 & 39). On July 19, 2019, BPPR filed its *Reply to Opposition to Motion to Dismiss the Verified Complaint* (Docket No. 40). On September 5, 2019, the Plaintiffs filed their *Opposition to BPPR's Motion in Docket No. 40.* (Docket No. 51).

On October 24, 2019, the court (Tester, BJ) entered an *Opinion and Order* denying the motion to dismiss filed by BPPR. The court held that:

> "In the case at hand, BPPR's motion to dismiss argues the dismissal standard of Rule 12(b)(6), made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7012, by stating that the Complaint falls short of the standards for stating a claim. BPPR also argues that the Complaint is time-barred.
> In short, BPPR provides a full throttle defense against Plaintiff's allegations in the Complaint. BPPR's arguments, however, are misplaced at this stage of the proceedings." (Docket No. 52).

On November 27, 2019, BPPR filed its *Answer to the Complaint*. (Docket No. 61). On December 4, 2019, the initial scheduling conference was held, and the parties were granted until April 2, 2020, to conclude discovery and until April 13, 2020, to file a motion informing the Court how they intend to litigate the instant adversary proceeding. (Docket No. 63). On April 13, 2020, the Plaintiffs filed a *Motion for Entry of Order Extending Deadlines to Finalize Discovery and to File Motion to Inform* requesting an extension of ninety (90) days from the date the lockdown is lifted to finalize discovery and inform how the parties intend to proceed and the same was granted on April 15, 2020. (Docket Nos. 65 & 66). On July 13, 2020, the parties filed a *Joint Motion to Inform and for Entry of Order Approving Discovery Plan* and the same was approved on August 4, 2020. (Docket No. 68).

In November 2020, the case was reassigned to the undersigned judge. (Docket No. 71). Thereafter, on January 29, 2021, the parties filed a *Joint Motion for Entry of Order Amending Scheduling Order at Docket Entry 69* by which the parties proposed the following timetable: (i) close of discovery: February 28, 2021; (ii) expert reports and disclosures: April 15, 2021; (iii) expert rebuttal report: May 15, 2021; (iv) expert depositions: June 15, 2021; and (v) joint pretrial report/ dispositive motions: August 17, 2021. The motion was granted on February 19, 2021. (Docket Nos. 73 & 78).

On February 1, 2021, the Plaintiffs filed a *Motion for Leave to Amend Complaint*. (Docket No. 74). On February 16, 2021, BPPR filed its *Opposition to Motion for Leave to File Amended Complaint*. (Docket No. 76). On February 23, 2021, the Plaintiffs filed their *Reply to Defendant's Opposition to Request for Leave to Amend the Complaint Filed at Docket No. 76*. (Docket No. 80).

On February 26, 2021, the parties filed a *Joint Motion for Entry of Order Amending Scheduling Order at Docket Entry 78* by which the parties proposed the following timetable: (i) close of discovery: March 19, 2021; (ii) expert reports and disclosures: April 30, 2021; (iii) expert rebuttal report: May 30, 2021; (iv) expert depositions: June 30, 2021; and (v) joint pretrial report/ dispositive motions: August 31, 2021. The motion was granted on March 1, 2021. (Docket Nos. 81 & 82). Thereafter, on March 25, 2021, the parties filed a *Joint Motion for Entry of Order Amending Scheduling Order at Docket Entry No. 82* by which the parties proposed the following timetable: (i) close of discovery: April 9, 2021: (ii) expert reports and disclosures: May 18, 2021; (iii) expert rebuttal report: June 15, 2021; (iv) expert depositions: July 15, 2021; and (v) joint pretrial report/ dispositive motions: September 15, 2021. The motion was granted on April 13, 2021. (Docket Nos. 88 & 93).

On March 18, 2021, the Plaintiffs filed the *First Amended Complaint* (Docket No. 86). On March 31, 2021, BPPR filed a *Supplement to Opposition to Motion for Leave to File Amended Complaint at Docket 76* (Docket No. 90). On April 7, 2021, the Plaintiffs filed their *Reply to the Supplement Opposing Leave to Amend Complaint Filed by BPPR at Docket Entry No. 90.* (Docket No. 92). On April 14, 2021, BPPR filed a *Motion for Leave to Sur-Reply to Plaintiffs' Reply to the Supplement Opposing Leave to Amend Complaint at Docket 92*. (Docket No. 94). On April 19, 2021, the Court granted BPPR's *Motion for Leave to Sur-Reply to Plaintiffs' Reply to the Supplement Opposing Leave to Amend Complaint at Docket 92*. In the Order, the Court informed

that it would consider the sur-reply filed by BPPR in its determination of whether the Plaintiffs will be granted leave to file an amended complaint at this juncture. (Docket No. 96).

On May 3, 2021, the parties filed a *Joint Motion for Entry of Order Amending Scheduling Order at Docket No. 93* by which the parties proposed the following timetable: (i) close of discovery: May 31, 2021: (ii) expert reports and disclosures: June 30, 2021; (iii) expert rebuttal report: July 30, 2021; (iv) expert depositions: August 31, 2021; and (v) joint pretrial report/ dispositive motions: October 15, 2021. The motion was granted on May 20, 2021. (Docket Nos. 98 & 99). On May 28, 2021, the parties filed a *Joint Motion for Entry of Order Amending Scheduling Order at Docket No. 99* by which the parties proposed the following timetable: (i) close of discovery: June 30, 2021: (ii) expert reports and disclosures: July 30, 2021; (iii) expert rebuttal report: August 27, 2021; (iv) expert depositions: September 30, 2021; and (v) joint pretrial report/ dispositive motions: November 15, 2021. (Docket No. 106).

On May 21, 2021, the Plaintiffs moved for the withdrawal of reference of the present action to the U. S. District court for the District of Puerto Rico. (Docket No. 100). BPPR filed its *Motion for Summary Judgment* and the *Statement of Uncontested Material Facts in Support of Motion for Summary Judgment* on August 25, 2021. (Docket Nos. 123 & 124). On January 4, 2022, the district court denied the Plaintiffs' request for withdrawal of refence. (Docket No. 142). On January 24, 2022, the Plaintiffs filed a *Motion for Extension of Time to Respond to BPPR's Motion for Summary Judgment at Dockets 123, 124* and the same was granted on February 3, 2022. (Docket Nos. 136 &143).

On February 7, 2022, the Plaintiffs filed their Opposition to Defendant's Motion for Summary Judgment and moved for summary judgment in their favor. (Docket No. 146). On said date, the Plaintiffs also filed the *Statement of Facts in Support of Plaintiffs' Cross Motion for Summary Judgment* (Docket No. 147) and their *Opposition to BPPR's Statement of Facts in*

*Support of its Motion for Summary Judgment at Docket No. 123*. (Docket No. 148). On February 10, 2022, the Plaintiffs filed a *Motion Submitting Exhibits and Exhibits Cross Reference Table in Support of Plaintiffs' Motions at Docket Entries 146, 147 & 148.* (Docket No. 149). On February 22, 2022, BPPR filed a *Motion for Extension of Time to Respond to Plaintiffs' Cross Motion for Summary Judgment* and the same was granted on February 23, 2022. (Docket Nos. 152 & 153). On March 24, 2022, BPPR filed a *Second Motion for Extension of Time to Respond to Plaintiffs' Cross Motion for Summary Judgment* and the same was granted on March 25, 2022 (Docket Nos. 158 & 160). On April 18, 2022, BPPR filed a *Final Motion for Extension of Time to Respond to Plaintiffs' Cross Motion for Summary Judgment* and the same was granted on April 19, 2022. (Docket Nos. 165 & 166). On April 20, 22, BPPR filed its *Omnibus: (I) Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment; and (II) Opposition to Plaintiffs' Cross Motion for Summary Judgment* (Docket No. 167) and its *Opposing Statement to Plaintiffs' Statement of Material Facts in Support of the Guallini's Cross Motion for Summary Judgment* (Docket No. 168). On April 27, 2022, the Plaintiffs filed a *Motion for Leave to File Sur-Reply to BPPR's Docket Nos. 167 and 168 and Extension of Time* and the same was granted on May 16, 2022. (Docket Nos. 171 & 174). On May 18, 2022, the Plaintiffs filed a motion for *Extension of Time to File Opposition to Docket Nos. 167 & 168* and the same was granted on May 19, 2022. (Docket Nos. 177 & 181). On June 8, 2022, the Plaintiffs filed a third motion for *Extension of Time to File Opposition to Docket Nos. 167 & 168* and the same was granted on June 10, 2022. (Docket Nos. 186 &187). On June 22, 2022, the Plaintiffs filed a *Sur-reply to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment; and Sur-reply to Defendant's Opposition to Plaintiff's Cross Motion for Summary Judgment* (Docket No. 192).

The complaint seeks to recover damages allegedly caused by BPPR's tortious conduct during negotiations between the parties for a short sale agreement. BPPR alleges that the short sale agreement was conditioned upon the Plaintiffs closing the sale prior to November 2, 2016. The Plaintiffs did not complete the sale prior to November 2, 2016, therefore on said date, BPPR foreclosed on its collateral and obtained an attachment order to execute its final and firm judgment on the Plaintiffs' assets. The Plaintiffs did not challenge, oppose, or object to BPPR's request, in the State Court, to foreclose on its collateral or request for an attachment order to collect on its deficiency.

**Position of the Parties**

Defendant BPPR

BPPR alleges that the complaint is time barred as the short sale negotiations occurred in November 2016 and the complaint was filed in February 2019, that is, over one year after the cause of action, if one exists, occurred. In the alternative, BPPR states that that the facts and admissions by Plaintiffs do not support their claims.  Moreover, the actions taken by BPPR related to the foreclosure and attachment order in a state court action are barred by the *Rooker-Feldman* doctrine.

*Article 1802*

The Complaint includes two causes of action under Article 1802 of the Puerto Rico Civil Code of 1930.[1] The first cause of action is based on allegations of negligence by BPPR in following federal regulations Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) ("RESPA"), Regulation X (12 C.F.R. § 1024) ("Regulation X"), Home Affordable Modification Program ("HAMP") (12 U.S.C. § 5219a et seq.), or Truth in Lending Act ("TILA") (15 U.S.C. § 1601(a) (the "Federal Regulations Cause of Action"). The second is based on BPPR's alleged tortious

---

[1] The court notes that the 1930 Puerto Rico Civil Code was derogated by Law 55 of June 1, 2020, effective November 28, 2020, now the Puerto Rico Civil Code of 2020. However, the 2020 Civil Code establishes that the tort liability is determined by the law in effect when the act(s) occurred. See articles 1189, et seq (31 L.P.R.A. § 9481, et seq.) and Art. 1536, et seq. (31 L.P.R.A. §10801, et seq.). Thus, the applicable law for this case is the 1930 Puerto Rico Civil Code.

-10-

interference and *culpa in contrahendo* (the "Tortious Interference and Culpa in Contrahendo Cause of Action").

A tort cause of action pursuant to the Puerto Rico Civil Code ("PR Civil Code") Art. 1802, 31 L.P.R.A. § 5141, prescribes within a year. 31 L.P.R.A. § 5298. The one-year statute of limitations begins to run when the party becomes aware of the alleged facts giving rise to the alleged damages and who caused them. Fraguada Bonilla v. Hosp. Aux. Mutuo, 2012 TSPR 126 (P.R. Aug. 13, 2012). If the party's failure to become aware of the facts giving rise to the alleged damages or who caused them is due to a lack of diligence on behalf of that same party, this consideration is not applicable. BPPR alleges that plaintiffs were aware by November 2, 2016, or, at the very least, by December 9, 2016, that BPPR had foreclosed on the property through the public auction after the short sale negotiations failed. The foreclosure notices were sent to the Plaintiffs. The Plaintiffs admit that, "[b]y December 9, 2016, to Guallinis' surprise, BPPR informed that the Property had been sold at public auction previously held on November 2, 2016." (Statement of Facts in Support of the Guallini's Cross Motion for Summary Judgment, Docket No. 147, pg. 13, par. 59). Plaintiffs' claims are time barred because all relevant events stated in the Complaint stem from BPPR's foreclosure of the property and alleged failure to complete a short sale agreement with the Plaintiffs. These events which may have allegedly caused harm to the Plaintiffs took place and were known by the Plaintiffs more than one year before the filing of the petition on December 27, 2017, and the instant complaint filed in February 2019. Similarly, any *culpa in contrahendo* and tortious interference claims would be time barred as they both stem from Article 1802 of the PR Civil Code. Plaintiffs' argument that the causes of action were tolled pursuant to 11 U.S.C. §108(a) is misplaced because as of the petition date (December 27, 2017), there were no causes of action that could be tolled because they had already lapsed on December 9, 2017.

*RESPA*

BPPR alleges in the alternative, that Plaintiffs "have not argued, and the evidence does not support, a claim pursuant to RESPA, Regulation X, TILA or HAMP as they have not mentioned,

let alone supported, the elements needed to establish a cause of action under any of these regulations." Relief under RESPA is made under its implementing regulation known as Regulation X and under TILA. The Complaint briefly mentions these provisions in the introduction and does not develop how they apply to the facts alleged in the Complaint. The Complaint has not included any of the required elements to establish a violation under RESPA.

A RESPA violation under §2605(e), as alleged by Plaintiffs, requires that if the "borrower sends a qualified written request ("QWR") for information relating to the servicing of a loan, said servicer needs to take action with respect to the inquiry no later than 30 business days after its receipt. 12 U.S.C. §2605(e)(2)(C). Before taking any action, the servicer shall provide the borrower a written response to the QWR." Therefore, to "establish a claim alleging violations of these subsections of RESPA, Plaintiffs must establish that (1) Defendant is a loan servicer; (2) Defendant received a QWR; (3) the QWR relates to servicing of a mortgage loan; (4) Defendant failed to respond adequately; and (5) Plaintiff is entitled to actual or statutory damages." Plaintiffs claiming RESPA violations must demonstrate a causal relation between the alleged loss and the violation. Maceira Lopez v. Doral Fin. Corp., 2012 WL 5986549, *5 (D.P.R. Nov. 29, 2012).

Under RESPA, a QWR is a "written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan." 12 U.S.C. §2605(e)(1)(A). The QWR must include a "statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. §2605(e)(1)(B)(ii). This statutory duty requires a loan servicer to provide a written response to a borrower's inquiry, but it "does not arise with respect to all inquiries or complaints from borrowers to servicers." Medrano v. Flagstar Bank, FSB, 704 F. 3d 661, 666 (9th Cir. 2012). The requirement indicating that "the letter must request information relating to servicing—ensures that the statutory duty to respond does not arise with respect to all inquiries or complaints from borrowers to servicers." Id.

The term "servicing" is defined by the statute as the process of "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for

escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. §2605(i)(3). The "servicing" of a loan refers to ordinary, scheduled payments a borrower makes per the pre-established terms of a loan agreement rather than payments related to loss mitigation or loan modification.

BPPR contends that Plaintiffs have not provided a QWR that complies with the above explained RESPA requirements. Plaintiffs have not alleged that BPPR failed to respond a QWR. Moreover, the only written request Plaintiffs include in their Complaint is a short sale offer they allegedly sent to BPPR on or around August 2016 reaffirming their interest in the short sale of the property and requesting BPPR to stop the foreclosure proceedings. Plaintiffs' written request does not constitute a QWR because it does not cover requests pertaining to short sale offers. Notwithstanding, BPPR responded to Plaintiffs' request within the required thirty (30) days. Thus, BPPR did not violate RESPA §2605(e). Even if the Court were to determine that the Plaintiffs meet the requirements pursuant to RESPA (which BPPR denies), Plaintiffs have not provided any evidence or pled any facts to establish a claim for damages in addition to the statutory limitation set forth pursuant to §2605(f)(1)(B). This subsection allows for "any additional damages in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." §2605(f). Plaintiffs are requesting damages of approximately $265,000.00, yet the Complaint is devoid of any allegation that supports a pattern or practice of noncompliance (as no such pattern exists) that would grant an award higher than the statutory limitation. Therefore, there is no evidence to establish a cause of action pursuant to RESPA or Regulation X for which relief can be granted.

BPPR contends that in all of the six (6) instances cited by the Plaintiffs, the same Loan Activity Report in which they base their allegations that BPPR violated Regulation X §1024.41(b), demonstrates that in every single occasion BPPR immediately acknowledged receipt of Plaintiffs' applications, requests and proposals and notified them of the required documents and/or rejected the proposal. (Docket No. 167, pgs. 8-10).

BPPR moved for foreclosure after it had already rejected the Plaintiffs' complete loss mitigation application. The foreclosure complaint was filed on November 13, 2015, and the Plaintiffs were never current on their obligations after the defaults that led to the filing of said complaint. For this reason, no filing was required from BPPR to stop the foreclosure proceedings on any of the short sale offers because it had already denied a complete loss mitigation application. See Regulation X §§1024.41(g) & 1024.41(i). The final short sale proposal whereby the Plaintiffs proposed to sell the property for $170,000.00 was made on or around October 17, 2016, less than thirty-seven (37) days before the foreclosure sale dates, and thus did not require BPPR to cancel any judicial sale. BPPR need not comply with the requirements of Regulation X for every subsequent short sale offer, given that Plaintiffs were still delinquent on their loan obligations and at least one of them was made less than thirty-seven (37) days to the foreclosure sale date. Moreover, if the Plaintiffs understood that BPPR's foreclosure was improper as it violated any provision of law, the Plaintiffs should have and could have objected to the process in the Puerto Rico State Courts.

*TILA or HAMP*

Plaintiffs fail to establish a violation from BPPR as to any of these regulations. There is no evidence produced, nor a developed argument that explains how any of the facts alleged in the Complaint support a violation pursuant to any of these statutes. The only section of TILA cited by Plaintiffs is 15 U.S.C. §1601(a) which defines the purpose of TILA, which is, "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him or her and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." Therefore, any claim pursuant to TILA should be deemed waived.

The cross motion for summary judgment fails to submit sufficient material facts that are not subject to a dispute to support any claim under RESPA, Regulation X, HAMP, or TILA.

-14-

*Rooker-Feldman Doctrine*

The Rooker-Feldman doctrine precludes Plaintiffs from bringing forth any cause of action resulting from a State Court Order. The First Circuit Bankruptcy Appellate Panel held that the Rooker-Feldman doctrine applies when: (1) the federal-court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state court judgment; (3) the plaintiff invites the federal court to review and reject the judgment; and (4) the state court judgment must have been rendered before the federal court proceedings began. Schwartz v. Schwartz (In re Schwartz), 409 B.R. 240, 247 (B.A.P. 1st Cir. 2008).  The Plaintiffs satisfy the four requirements for the Rooker-Feldman doctrine to apply; namely (1) Plaintiffs lost in state court and want this Federal court to review and ultimately reject, set aside or grant damages for a final, firm and executed state court foreclosure judgment; (2) Plaintiffs would have not suffered any damages had BPPR never foreclosed on the property, or if the Attachment Order never existed. The issues in this case are inextricably intertwined with the foreclosure case. Plaintiff Juan J. Guallini specified in his deposition that aside from the Foreclosure Judgment and Attachment Order allowing the collection of the deficiency claim, there is no other damage caused by BPPR and that the Foreclosure Judgment and Attachment Order was the reason for filing this adversary proceeding. Plaintiffs are claiming as actual damages $114,774.72, which is the same amount established as the deficiency resulting from the state court in the Attachment Order and the Foreclosure Judgment; (3) Plaintiffs are requesting this Court to revert the State Court's Foreclosure Judgment and Attachment Order which have been valid and final since the year 2017 before the Plaintiffs filed for bankruptcy protection. All the claims included in the Complaint should have been litigated in the State Court proceeding. Moreover, any claim against BPPR pursuant to RESPA, Regulation X, TILA, or HAMP (which BPPR denies) should have been a defense, if any, in the Foreclosure case; and (4) the Foreclosure Judgment and all subsequent execution orders, like the Attachment Order, became final, firm, and unappealable before the bankruptcy petition was filed. BPPR also argues that the Complaint should be dismissed because Plaintiffs' damages are speculative at best. As to the actual damages for the deficiency claim, BPPR has not pursued this claim and Plaintiffs have not made

-15-

a single payment towards the deficiency. Thus, this purported damage never materialized and should be dismissed. Plaintiffs indicate that they have suffered $100,000.00 in emotional losses but have not provided any evidence to support such loss. Lastly, Plaintiffs claim in the amount of $50,000.00 for punitive damages should be summarily dismissed because punitive damages are not available to the Plaintiff under 31 L.P.R.A. §5141 as a matter of law.

*Breach of contract is not a cause of action in the Complaint*

Plaintiffs' two causes of action in the Complaint do not include a claim for breach of contract. Summary judgment cannot be provided for a claim that was not pled or asserted in the Complaint which BPPR did not respond to in its Answer, and upon which no discovery has been undertaken. Plaintiffs sought leave from this court to amend the Complaint and included for the first time, a breach of contract claim. (Docket No. 74). The parties have submitted multiple oppositions, replies and sur-replies on the issue which is currently submitted for consideration before this court.

**<u>Plaintiffs</u>**

*Article 1802*

The Plaintiffs contend that their claims under Article 1802 of the PR Civil Code and RESPA are not time barred because the Plaintiffs effectively tolled any statute of limitation pending upon the filing of the bankruptcy petition pursuant to 11 U.S.C. §108(a). Plaintiffs' position is that, "[r]egarding the tortious interference claim under section 1802 of the Puerto Rico Civil Code, as stated and rebutted by the Plaintiffs declaration at the depositions under penalty of perjury, Plaintiffs learned of BPPR's tortious interference with the purchaser under the option contract on or about March or April 2017. [See Exhibit 1-Deposition to Juan Guallini, P. 117, LL 14-25, P. 118, LL 1-23]." (Docket No. 146, pg. 6, ¶17). Thus, the extracontractual relief against Defendant was preserved and tolled by virtue of section 108.

*RESPA*

The Plaintiffs contend that the statute of limitations for RESPA is three (3) years. The violations under RESPA arising out of the loss mitigation request and dual tracking which allegedly occurred between July 10, 2015, and the last one on November 2, 2016, were all timely filed when the Complaint was filed on February 4, 2019, because the three-year period was tolled for two years pursuant to section 108(a) when the bankruptcy petition was filed in December 2017. See Rodriguez- Wilson v. Banco Santander de Puerto Rico, 501 F. Supp. 3d 53 (D.P.R. 2020) (holding that RESPA "claim brought by mortgagor, arising from mortgagee's alleged violation of dual tracking prohibition through pursuit of foreclosure while also working with mortgagor to avoid foreclosure, accrued, and three-year statute of limitations began to run").

*Article 1864*

The Plaintiffs argue that actions for breach of contract are determined by Article 1864 of the PR Civil Code which provides a fifteen (15) year statue of limitations. Plaintiffs contend that a "… valid short sale contract was perfected between the parties when the bank made a counteroffer and reiterated that the Plaintiffs had to meet the appraisal value of $170k to prevent foreclosure, the object was the Property, and consent was perfected at the precise moment when the Plaintiffs met Defendant's Counteroffer on October 17, 2016. [See, for example, the Guallini's statement of facts #44 to #50]. Upon the Plaintiffs' acquiescence to meet the counteroffer in the Short Sale Approval Letter of October 25, 2016, and upon the consent to proceed effected by Plaintiffs on that very same date, the contract was binding. Such contract was posteriorly breached by BPPR on November 2, 2016, a week later, when they went ahead and foreclosed on the property notwithstanding their accurate written acceptance to relief Plaintiffs from the mortgage and foreclosure." (Docket No. 146, pg. 8, ¶ 23 & 24); [See Exhibit 14- Short Sale Approval Letter, see also Exhibit 10- Denial and Counteroffer].

*Rooker-Feldman Doctrine*

Plaintiffs argue that the Rooker-Feldman doctrine is inapplicable to the instant adversary proceeding because the Plaintiffs' complaint seeks to establish liability to BPPR under RESPA for their tortious acts against the Plaintiffs in the loss mitigation process and for breach of contract. The foreclosure of the Plaintiffs' property is just an undisputed material fact to establish lender's liability against the Debtor for their egregious conduct in violation of basic tenants of good faith and fair dealings imposed on the bank in protection of consumers. It is undisputed that the Defendant achieved foreclosure by default and that Plaintiffs are the loosing party due primarily with the consummated agreement that the bank would relieve them from the mortgage. The Plaintiffs are not seeking to review or nullify the foreclosure judgment. As to the second prong, the Plaintiffs complain about "… the inequitable conduct in the loss mitigation process because the Bank ignored basic principles of good faith dealings, entered into a binding contract with the Plaintiffs, flagrantly positioned themselves to leave the Plaintiffs in the dark about the process, to turn around and interfere with the purchaser under an approved 'short sale' of the Property that would enable them to be relieved from their mortgage. Upon the breach of contract, the inequitable conduct of the Bank is sanctionable and should not be interpreted as a collateral attack to a judgment entered by default, behind the back of the Plaintiffs with bad faith." (Docket No. 146, pg. 12, ¶ 40). As to the third prong, Plaintiffs seek for the court to find BPPR liable for their negligent and inequitable actions against Plaintiffs and that the Bank pays for the suffering imposed on the Plaintiffs, primarily due to their negligence and breach of contractual duties against the Plaintiffs. The Plaintiffs are not requesting for the court to review the contents of the Judgment or that the court rejects the finality of the foreclosure judgment. The Rooker-Feldman doctrine is inapplicable in the instant case because it fails to meet the four-pronged test.

The Plaintiffs argue that the determinations as to the damages remain disputed because no formal discovery was undertaken by the parties on the experts consulted, disclosed and/or retained, because the reference was withdrawn to the United States District Court for the District of Puerto

Rico before the expert's discovery deadline elapsed. If BPPR is found liable pursuant to the state and federal causes of action, thereafter discovery proceedings for damages will resume.

Cross Motion for Summary Judgment

*RESPA/ Regulation X*

Regulation X, which implements RESPA, 12 U.S.C. §2601, requires from a servicer certain notification requirements in a loss mitigation process for an application submitted 45 days or more prior to a foreclosure sale. See 12 C.F.R. §1024.41(b). Plaintiffs contend that BPPR incurred in six (6) violations under 12 C.F.R. §1024.41(b) by not issuing any written notification in writing to the Plaintiffs within five (5) days of receipt of the various surrender offers in the following amounts: $130,000.00; $150,000.00; $154,000.00, $155,000.00 and $145,000.00. These surrender offers were submitted to BPPR on or prior to August 31, 2015, which is more than 45 days prior to the first scheduled foreclosure sale in the case which was scheduled for October 9, 2016. No reference is found in BPPR's records regarding these notices. Plaintiffs also contend that BPPR incurred in at least six (6) violations under 12 C.F.R. §1024.41(b) by not issuing the required initial notifications to the Guallini's within five (5) days of receipt of their loss mitigation applications. The court notes that the Plaintiffs use interchangeably the terms surrender offers and loss mitigation applications in their allegations that BPPR failed to abide by 12 C.F.R. §1024.41(b).

Plaintiffs further contend that BPPR incurred in at least five (5) violations under Regulation X, 12 C.F.R. §1024.41(g) by not stopping the foreclosure proceedings as to the five (5) different surrender offers which were made on or prior to August 31, 2015, more than thirty-seven (37) days prior to the first scheduled foreclosure sale in the case. Plaintiffs argue that, "… according to 12 C.F.R. §1024.41(g), BPPR had the obligation to stop their predatory offensive when the Plaintiffs submitted or completed the referred loss mitigation applications and/or upon the issuance of the Short Sale Approval Letter." (Docket No. 146, pg. 21, par. 68).  "The regulations restrict a servicer from moving for a foreclosure judgment or an order of sale if a borrower submits a complete loss

-19-

mitigation application after a servicer has made the first notice or filing required by law for a judicial foreclosure but more than 37 days before a foreclosure sale, unless: (1) the servicer informs the borrower that the borrower is not eligible for any loss mitigation option; (2) the borrower rejects all loss mitigation options offered by the servicer; or (3) the borrower fails to comply with the terms of an agreement on a loss mitigation option. 12 C.F.R. §1024.41(g). Roosevelt Cayman Asset Co. II v. Mercado, 259 F. Supp. 3d 1, 5 (D.P.R. 2016)." (Docket No. 146, pg. 19, par. 62)

Plaintiffs allege that during the loss mitigation process, BPPR denied the Plaintiffs' application and thus, violated the due diligence provisions of 12 C.F.R. §1024.41(b), because it did not take into account the Employment Letter from September 6, 2016, informing the Guallini's imminent loss of income (Exhibit 14). Moreover, BPPR failed to comply with 12 C.F.R. §1024.41(d) because it did not propose to Plaintiffs any qualifying property retention alternatives in loss mitigation other than a short sale nor expressed to them that they were not being evaluated on other loss mitigation alternatives.

*Article 1802*

Plaintiffs contend that BPPR's alleged violations to RESPA and Regulation X provisions were the proximate cause to the financial and emotional harm caused to the Plaintiffs. BPPR alleged violations were the following: BPPR had an obligation to stop the foreclosure regarding the thirty-seven (37) days before the scheduled foreclosure date. BPPR did not file motions in the foreclosure proceeding to stop the foreclosure at any relevant stage concerning the five offers which were submitted and completed at least thirty-seven (37) days prior to the scheduled foreclosure. BPPR did not stop the foreclosure proceedings when it received the $170,000.00 offer and/or Defendant's counteroffer which fulfilled the loss mitigation procedures and created a binding contractual obligation to stop the foreclosure and pursue the short sale. BPPR denied the short sale alternative despite having the September 7, 2016, letter which indicated Plaintiffs' imminent loss of income. These undisputed facts establish that BPPR should be found liable to Plaintiff under section 1802 of the Puerto Rico Civil Code.

*Contractual Tortious Interference under 31 L.P.R.A. §5141*

Plaintiffs allege that, "[i]t is obvious that BPPR acted negligently by issuing a letter on October 25, 2016, to Plaintiffs indicating that the foreclosure would be avoided. The Guallinis even subscribed an addendum to the contract containing the $170k Offer with Mr. Merced Mora recognizing the final agreement with BPPR. However, on November 2, 2016, BPPR foreclosed on the Property. As such, it is undisputed that BPPR not only breached its duty of care and contractual duties, but also acted with tortious conduct and negligently against Plaintiffs. Notwithstanding this, the Plaintiffs, as lay people, were under the impression that upon BPPR's representations, the foreclosure would be stopped. However, BPPR illegally foreclosed the Guallinis property and tortiously interfered with the contract between the Guallinis and Mr. Merced Mora. Also, to Plaintiffs' surprise, on or around March or April 2017, the Plaintiffs became aware that the bank had sold the property to Mr. Merced Mora, who was the Guallinis' proposed purchaser for the property and continued the dealings with Mr. Merced that the Guallinis' had commenced, until consummation of the sale to Mr. Merced Mora, notwithstanding there was a valid contract extended between the purchaser and Plaintiffs." (Docket No. 146, pgs. 24-25, pars. 87-90).

The Plaintiffs allege that there was a valid agreement executed by Plaintiffs and Mr. Merced Mora which was extended beyond the date when BPPR foreclosed on the property. BPPR knew of the existence of this contract between Plaintiffs and Mr. Merced Mora and removed Plaintiffs from the transaction and sold the property directly to Mr. Merced Mora. The Plaintiffs allege that, "[i]nstead of continuing to work with the Plaintiffs under the terms and conditions of the Short Sale Approval Letter and the Addendum, BPPR instead tortiously foreclosed on the property and continued to work with Mr. Merced Mora in violation of the Addendum Contract, while it was in effect, resulting in the consummation of the sale to Mr. Merced Mora in detriment to the contractual obligation with the Plaintiffs." (Docket No. 146, pg. 26, par. 94). Plaintiffs allege that Defendant continued collection efforts against them for the deficiency in the amount of $114,774.72, thereby causing actual damages for such amount, and forcing Plaintiffs to incur in

attorney's fees, expenses and costs against such collection efforts and inequitable conduct. The interference with the contract was the proximate cause of Plaintiffs' injuries.

*Liability under breach of contract*

To properly assert a claim for breach of contract, a party must sufficiently allege (1) a valid contract; (2) breach of that contract, and (3) resulting damages. Under Puerto Rico law, there are three requirements for a valid contract; namely: (1) the contracting parties' consent; (2) a definitive, legal object of the contract; and (3) consideration. Plaintiffs contend that a valid short sale contract was perfected between the parties and consent was perfected at the moment when the Plaintiffs met Defendant's counteroffer. A binding contract was formed when BPPR issued the Short Sale Approval Letter and the Guallinis accepted the same by visiting BPPR, which reiterated intentions to consummate a loss mitigation short sale process upon the acceptance of the offer. BPPR failed to comply with its obligations under the short sale contract with the Guallinis by failing to stop foreclosure of the property pursuant to the Short Sale Approval Letter. By failing to abide by the Short Sale Contract, BPPR positioned itself in a favorable economic position. BPPR sold the property to the Plaintiffs' purchaser and also procured an Order from the State Court to garnish and confiscate $114,774.72 from the Guallinis. Under the Short Sale Contract, BPPR would get $170,000.00, instead Defendant by breaching their contract and in bad faith, decided to collect $160,000.00 from Mr. Merced and $114,774.42 from the Guallinis for a return on the credit facility in the amount of $274,774.42. The summation of these two amounts is well above Plaintiff's balance in the mortgage which was approximately in the amount of $185,000.00. Plaintiffs allege that the Short Sale Approval Letter, was another contract that was perfected and upon acceptance, the Plaintiffs had written communication and accurate information that BPPR would take steps in good faith to release them from the mortgage and avoid foreclosure. "Prior to the Petition Date, Defendant BPPR represented to Plaintiffs that the $170k offer and/or Defendant's counteroffer had been approved, and that such approval had the purpose and result of consummating the sale of the property for the cancellation of the mortgage lien over the property, as well as to avoid the foreclosure process." (Docket No. 146, pg. 30, par. 112).

-22-

Plaintiffs allege that as a direct consequence of BPPR's breach of the Short Sale Contract with Plaintiffs, the Guallinis suffered actual and emotional damages, loss of profits, pecuniary losses, and had to incur in significant attorney fees, costs and expenses. Damages which are still subject to discovery proceedings.

**Uncontested Material Facts**

After considering BPPR's *Statement of Uncontested Material Facts in Support of Motion for Summary Judgment* (Docket No. 123); Plaintiffs' *Statement of Facts in Support of the Guallinis' Cross Motion for Summary Judgment* (Docket No. 147); *Opposition to BPPR's Statement of Facts in Support of its Motion for Summary Judgment at Docket No. 123* (Docket No. 148) and *Opposing Statement to Plaintiffs' Statement of Material Facts in Support of the Guallinis Cross Motion for Summary Judgment* (Docket No. 168), the court finds that the following are the uncontested material facts:

1. Juan Guallini Indij and Raquel Medina Rampolla filed a voluntary petition under the provisions of Chapter 13 of the Bankruptcy Code on December 27, 2017. Plaintiffs filed the captioned adversary proceeding on February 4, 2019 (Docket No. 1).

2. BPPR filed claim #1-1 as an unsecured claimant for credit card debt in the amount of $16,219.42.

3. Prior to the petition date, on November 29, 2005, Plaintiffs entered into a loan agreement and mortgage with BPPR by means of Deed of Mortgage No. 734 secured with a real property located at Dorado Del Mar LL-29, Playa Street Dorado, Puerto Rico as collateral.

4. The Plaintiffs rented the property from March 2013 to March 2015 to the Ramos-Lamboy family. (Docket No. 123, Exhibit 1).

5. Prior to contacting BPPR regarding their financial needs, Plaintiffs hired a realtor to either rent or sell the property. (Docket No. 147, Exhibit 1 at Docket No. 123).

6. By February 2015, the Plaintiffs rented an apartment in Miramar, Puerto Rico. (Docket No. 123, Exhibit 1; Exhibit 2, pg. 33, L. 4).

7. On or around May 13, 2015, Plaintiffs visited the loss mitigation division at BPPR to discuss their obligations under the Loan Agreement.

8. BPPR's Loan Activity Report has an entry dated May 14, 2015, that states, "[b]ased upon a referral, the client was called for an orientation of a property that was rented. The client does not have a permanent job because his work is based on contracts. The client indicates that he will be signing a contract on May 25 and after he gathers the pay stubs he will communicate with [BPPR] to discuss alternatives. (Docket No. 123, Exhibit 12, pg. 78).

9. On or around May 1, 2015, was the date that the Plaintiffs made their last payment on the mortgage of their main residence.

10. BPPR's Loan Activity Report has an entry dated July 10, 2015, that states, "[c]lient in office with documents to work property surrendered in lieu of payment ("dación"). Clients do not live the property. Documents of income and expenses were retained and internal documents were handed so that both clients complete the same. The documents will be handed in by Monday. (Docket No. 123, Exhibit 12, pg. 74).

11. On September 8, 2015, BPPR denied Plaintiffs' request for a modification of their monthly payments under the Loan Agreement. (Docket No. 123, Exhibit 6).

12. Also, on September 8, 2015, BPPR represented to the Guallinis that a short sale option was available if they could find an interested buyer. (Docket No. 123, Exhibit 12, pg. 68).

13. At the time of the Surrender Offer, no foreclosure sale had been scheduled. (Docket No. 123, Exhibit 10: September 1, 2016, Public Bid Notice Letter).

14. On November 13, 2015, BPPR filed a complaint in the Court of First Instance of Bayamón ("State Court") under Civil Case No. D CD2015-2735 (the "Foreclosure Case") for collection of monies under the Loan Agreement and to foreclose on the mortgage over the property. The complaint was properly served on the Plaintiffs. (Docket No. 123, Exhibit 7).

15. On or around January 5, 2016, the Plaintiffs visited BPPR with a short sale offer in the amount of $130,000.00. (Docket No. 123, Exhibit 12, pg. 55).

16. At the time of the $130,000 short sale offer, no foreclosure sale had been scheduled. (Docket No. 123, Exhibit 10: September 1, 2016, Public Bid Notice Letter).

17. On January 12, 2016, BPPR filed a motion requesting an Order for entry of default in the State Court foreclosure case No. DCD2015-2735. (Docket No. 1, pg. 6, par. 13; Docket No. 61, pg. 3, par. 13).

18.  On February 16, 2016, the State Court entered a judgment in favor of BPPR for the collection of monies due under the Loan Agreement in the amount of $185,527.73 plus interest and for the foreclosure (sale in public auction) of the mortgaged property if the Plaintiffs do not pay the entirety of the Judgment amounts. The Judgment was not appealed. (Docket No. 123, Exhibit 7).

19.  BPPR requested an appraisal of the property. The property as of February 27, 2016, was appraised with an estimated value of $170,000.00 (Docket No. 123, Exhibit 8).

20. On or around March 9, 2016, BPPR rejected the First Short Sale Offer in the amount of $130,000.00. (Docket No. 123, Exhibit 12, pg. 44).

21. On or around March 9, 2016, the Plaintiffs forwarded to BPPR's loss mitigation unit a Second Short Sale Offer in the amount of $150,000.00. On March 11, 2016, BPPR via email rejected the Second Short Sale Offer and made a counteroffer of $170,000.00. (Docket No. 123, Exhibit 12, pg. 43; Exhibit 19).

22. At the time of the $150,000.000 Short Sale Offer, no foreclosure had been scheduled. (Docket No. 123, Exhibit 10: September 1, 2016, Public Bid Notice Letter).

23. The Plaintiffs on March 18, 2016, responded to BPPR with a counteroffer from the prospective buyers in the amount of $154,000.00 for the purchase of the property. On March 24, 2016, BPPR replied via email that the $154,000.00 offer was not approved and if they wanted to improve the offer to communicate as soon as possible. (Docket No. 123, Exhibit 19; Exhibit 12, pg. 43).

24. At the time of the $154,000.000 offer, no foreclosure sale had been scheduled. (Docket No. 123, Exhibit 10: September 1, 2016, Public Bid Notice Letter).

25. On May 12, 2016, the State Court entered the order and writ authorizing the collection of the amounts due under the Loan Agreement and the foreclosure of the mortgage over the property which were notified on May 18, 2016. (Docket No. 123, Exhibit 9).

26. On May 27, 2016, the Plaintiffs visited the offices of BPPR to request the status of the short sale offer which had been denied because the offer was too low. The client indicates that he has an offer for $155,000.00, but as consulted with Daniel Maldonado the counteroffer is for $170,000.00. (Docket No. 123, Exhibit 12, pg. 38).

27. At the of the $155,000.000 offer, no foreclosure sale had been scheduled. (Docket No. 123, Exhibit 10: September 1, 2016, Public Bid Notice Letter).

28. On June 29, 2016, the State Court issued a Notice of Public Auction and Foreclosure for the Property (Docket No. 61, par. 17).

29. The dates for the public sale or foreclosure under the Public Auction were October 19, 2016; October 26, 2016, and November 2, 2016. (Docket No. 123, Exhibit 10).

30. By at least September 1, 2016, the Plaintiffs were aware of the dates for the public sale and foreclosure under Public Auction. (Docket No. 1, par. 17; Docket No. 123, Exhibit 10).

31. On or around August 31, 2016, and September 7, 2016, Plaintiffs visited the loss mitigation division at BPPR with the Third Short Sale Offer of the property in the amount of $145,000.00 (Docket No. 123, Exhibit 12, pgs. 27-28).

32. On September 7, 2016, the Guallini's served BPPR with a letter as to Mr. Juan J. Guallini's income up to September 6, 2016, with EP Puerto Rico. (Docket No. 149, Exhibit 11).

33. BPPR's Loan Activity Report has an entry dated September 9, 2016, that states, "the clients were called to their contact number and a message was left to contact [BPPR]. The case is not going to a short sale due to the offer. The surrender ("entrega") must be

worked out and the client has to clarify bank statement details." (Docket No. 123, Exhibit 12, pg. 26).

34. The $145,000.00 offer had been submitted by the Guallinis more than forty-five days (45) prior to the scheduled foreclosure sale. (Docket No. 123, Exhibit 10: September 1, 2016, Public Bid Notice Letter).

35. On September 28, 2016, BPPR rejected the Third Short Sale Offer. (Docket No. 123, Exhibit 12, pg. 23).

36. BPPR's Loan Activity Report has an entry dated September 28, 2016, that states, "Iris Santana- case discussed with Approvals JG. Letter of denial is sent because after reviewing the financial information that was provided, we have determined that you have the ability to continue making the mortgage payments utilizing cash reserves or other assets. Letter is sent by mail. (Docket No. 123, Exhibit 12, pg. 23).

37. Plaintiffs did not appeal BPPR's denial of the First, Second or Third Short Sale Offers. Plaintiffs were unaware that they had the right to appeal the same. (Docket No. 123, Exhibit 5, pg. 33, L. 7; pg. 38, L. 12; and pg. 39, L. 8).

38. BPPR's Loan Activity Report has an entry dated October 14, 2016, that states, "[c]lient in office to present short sale offer. It was indicated that the case was denied due to payment capacity in 09/29. Client insists that the offer be presented. The case will be discussed with Jesus Rivera. The case has a public auction for October 19 and an orientation was given as to this. In a prior evaluation it was determined that the client has the repayment capacity." (Docket No. 123, Exhibit 12, pg. 21).

39. On September 26, 2016, the Guallinis cancelled their certificate of deposit to complete the $10,000.00 that was necessary to satisfy the dollar amount of BPPR's counteroffer in the amount of $170,000.00. (Docket No. 149, Exhibit 13).

40. BPPR's Loan Activity Report has an entry dated October 17, 2016, that states, "Iris Santana- client is in office to offer $170,000.00. Client informs that he currently does

not have a job. Discussed with the approvals department." (Docket No. 123, Exhibit 12, pg. 20).

41. BPPR's Loan Activity Report has an entry dated October 18, 2016, that states, "[t]he case is consulted with JG because the client submitted a letter from his employer indicating that he is has not been working in a project for the company since October 1, 2016, JG indicated not to regard the income that appears in the bank statements because they do not represent the actual reality of the client." (Docket No.123, Exhibit 12, pg.19).

42. BPPR's Loan Activity Report has an entry dated October 19, 2016, that states, "[a] preliminary evaluation is realized; Income; $0.00 [actual reality]; Expenses; $6,930.01. Client presents short sale offer for $170K. Purchaser will finance with Moneyhouse $160K and $10K will be provided by client. YMelecio." (Docket No. 123, Exhibit 12, pg. 18).

43. BPPR in a letter dated October 25, 2016, informed the Plaintiffs that it had approved a Short Sale with a minimum sales price of $160,000.00 plus a $10,000.00 contribution from Plaintiffs. The letter further states that if they are interested in reaching an agreement on the Short Sale prior to the foreclosure of the property, it is necessary for you to communicate with the bank prior to November 2, 2016. (Docket No. 123, Exhibit 11).

44.  BPPR's loan activity report has an entry dated October 25, 2016, that indicates that they received the file from the committee that authorized to vacate the second public auction. On 10/26/2016 the short sale must close before the public auction date of November 2, 2016. The client was notified, and they are waiting for the buyer's response. (Docket No. 123, Exhibit 12, pg. 15).

45. A Purchase Contract Addendum dated October 25, 2016, was signed between the Plaintiffs/Sellers and Mr. Evaristo Meced Mora/ Buyer for the sale of the property in Dorado in the amount of $160,000.00. (Docket No. 149, Exhibit 15).

-28-

46. The Plaintiffs' realtor, Ms. Marilia Colon emailed the prospective buyer, Mr. Evaristo Merced on October 25, 2016, informing him that the short sale was approved pursuant to the terms in the contract/offer for the sales purchase with Mr. Evaristo Merced and as a requirement it has been stipulated that the closing must be completed in a week. The realtor had included the Plaintiffs in this email communication. (Docket No. 123, Exhibit 13).

47. On October 26, 2016, Ms. Marilia Colon, Plaintiffs' realtor, emailed the Plaintiffs informing them that she had sent a copy of the letter approving the short sale to the buyer and to their mortgage bank. Ms. Colon also informs the Plaintiffs that she has emailed them an example (Citibank) of the type of document BPPR is supposed to generate for the approval of the Short Sale. She further states that if they can get from the Purchaser and his mortgage bank the HUD-1 or the preliminary Closing Disclosure before November 1, 2016, it is her understanding that you may obtain the approval for the closing to be completed. On October 26, 2016, at 9:42am the Guallinis forwarded an email from their realtor Marilia Colón to Yashira Melecio, with a copy to Abdiel Guzman from BPPR, on the official documentation needed from BPPR to close on the short sale (Docket No. 123, Exhibits 13 & 14).

48. After the 9:42 am email, the Guallinis started the process to obtain the requested documents. Also on October 26, 2016, at 4:51pm, the Guallinis sent an email to Yashira Melecio from BPPR requesting to be called back regarding the documents request. (Docket No. 123, Exhibit 15).

49. On November 1, 2016, Ms. Yashira Melecio, a BPPR loss mitigation officer, emailed Plaintiff Juan J. Guallini inquiring about the status with the buyer, given that the public auction is scheduled for tomorrow, and they need to close today. (Docket No. 123, Exhibit 15).

50. On November 2, 2016, BPPR foreclosed on the property and the Deed of Judicial Sale and Cancellation of Mortgage Note was executed. (Docket No. 123, Exhibit 16).

-29-

51. BPPR's Loan Activity Report has an entry dated November 4, 2016, that states that a short sale was approved on October 25, 2016, but upon management's request it had to close before November 2, 2016. A letter was sent to the clients and to the realtors. As of November 2, 2016, no response was received from the realtors, thus the legal department continued with the scheduled public auction. (Docket No. 123, Exhibit 12, pg. 10).

52. BPPR's Loan Activity Report has an entry dated December 8, 2016, that reads that the client communicated with [BPPR] because the property had been auctioned. [BPPR] indicated that the case was approved since October 25, 2016, and the case had not been closed. (Docket No. 123, Exhibit 12, pg. 7).

53. Plaintiffs assert in the Complaint that, "[b]y December 9, 2016, Mr. Merced Mora had delivered all required documents; however, to Plaintiffs' surprise, on that date, Defendant informed that the property had been sold through the Public Auction previously held on November 2, 2016." (Docket No. 1, par. 25).

54. In March 2017, Plaintiffs learned that BPPR had conducted the sale of the Property to the Guallinis' own proposed purchaser Mr. Merced Mora, who, at that juncture, was living at the property. Plaintiffs did not have counsel in state court when the foreclosure judgment became final, and the motion to execute judgment was granted by default.

55. On April 17, 2017, the state court entered an attachment order against the Plaintiffs for the amounts remaining (such amounts, the "Deficiency Claim") under the Loan Agreement (the "Attachment Order"). (Docket No. 123, Exhibit 18).

56. The April 17, 2017, garnishment order from the state court, authorizes BPPR to seize anything belonging to Plaintiffs and ordering the seizure of any bank account in their name. The order also mandated that any employer retain 25% of their earnings to satisfy BPPR's alleged debt, among other remedies afforded to BPPR. (Docket No. 123, Exhibit 18).

57. The Plaintiffs did not request reconsideration and/or appeal the Attachment Order. See Civil Case No. DCD2015-2735 in the Court of First Instance of Bayamón.

58. BPPR did not send any collection letters or take any other action to enforce the Attachment Order or collect on the Deficiency Claim. (Docket No. 123, Exhibit 5, pg. 108, L. 24-25, pg. 109, L. 1-6).

59. BPPR has not collected, and the Plaintiffs have not paid, any amounts due under the Deficiency Claim. (Docket No. 123, Exhibit 5, pg. 113, L. 5-6, Exhibit 2, pg. 130, L. 1-16).

60. BPPR has not filed a proof of claim in this bankruptcy case for the Deficiency Claim. (See Bankruptcy Case, Claims Register).

61. Around December 2018, the Plaintiffs moved to the city of Decatur, Georgia.

62. Plaintiff Raquel Medina Rampolla stated that after moving to Atlanta, Georgia she started a new job in January 2019 at Bilingual Therapies. (Docket No. 123, Exhibit 2, pgs. 20-21).

63. After the bankruptcy filing, one of the Guallinis' parents passed away. Upon such demise, the Guallini's obtained enough through inheritance which were utilized to pay for the bankruptcy plan in full. (Lead Case No. 17-07489, Docket No. 94).

64. On April 29 and April 30, 2021, the Debtors filed a post confirmation plan and amended the bankruptcy schedules to pay of the standing balance of their Chapter 13 plan and obtain a discharge. (Lead Case No. 17-07489, Docket Nos. 67 & 68).

65. On August 30, 2021, the Guallinis obtained a bankruptcy discharge. (Lead Case No. 17-07489, Docket No. 95).

### **Legal Issues**

The first legal issue the Court needs to address, and which is one that is raised *sua sponte* by the Court is whether it has subject matter jurisdiction over the claims in this adversary proceeding given that the Debtors obtained their bankruptcy discharge pursuant to 11 U.S.C. §1328(a). on August 30, 2021 (Lead Case No. 17-07489, Docket No. 95). Only if the Court

determines that it has jurisdiction, it must delve into the legal claims regarding RESPA, Regulation X, TILA, HAMP, and Article 1802 of the PR Civil Code claims. For the reasons that follow, the Court finds and concludes that, at this juncture, it does not have subject matter jurisdiction. Thus, it will not address the merits of the legal claims.

### Applicable Law & Analysis

*The Bankruptcy Court's jurisdiction*

This court recently had the opportunity to delve into the issue of lack of subject matter jurisdiction in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(1) in the adversary proceeding of Diaz Irizarry v. Diaz Irizarry & Betteroads Asphalt, LLC (In re Betteroads Asphalt LLC), 2021 Bankr. LEXIS 3081, at *31-38 (Bankr. D.P.R. November 8, 2021). The Court in its analysis as part of the applicable law and analysis regarding subject matter jurisdiction included the following:

> "Lack of subject matter jurisdiction may be raised at any time.  Indeed, even if the litigants do not identify a potential problem in that respect, it is the duty of the court—at any level of the proceedings—to address the issue *sua sponte* whenever it is perceived." 2 Moore's Federal Practice - Civil § 12.30 (2021); See also Fed. R. Civ. P. 12(h)(3) applicable in bankruptcy proceedings through Fed. R. Bankr. P. 7012(b); In re Recticel Foam Corp., 859 F. 2d 1000, 1002 (1st Cir. 1988) ("a court has an obligation to inquire *sua sponte* into its subject matter jurisdiction, and to proceed no further if such jurisdiction is wanting"); Goldsmith v. Massad (In re Fiorillo), 494 B.R. 119, 142 (Bankr. D. Mass. 2013) (bankruptcy courts are "obligated to determine whether and to what extent [they] have jurisdiction to hear and determine all counts of the complaints"); Feliciano v. Dubois, 846 F. Supp. 1033, 1041 (D. Mass. 1994) ("a court always had an obligation to consider, even on its own initiative as well as on motion of an opposing party, whether it has subject matter jurisdiction").

> The jurisdiction of the bankruptcy courts is grounded in, and limited by, statute. See Celotex Corp. v. Edwards, 514 U.S. 300, 307, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995). "Subsections 1334(a), (b) and (e) of title 28, United States Code, establish the jurisdiction of the federal district courts over title 11 cases, over civil proceedings that take place under the umbrella of a title 11 case and over property of the title 11 estate, respectively." Alan N. Resnik & Henry J. Sommer, 1 Collier on Bankruptcy, ¶3.01[1] (16th ed. 2021). 28 U.S.C. §1334, provides that the district courts have jurisdiction over two main categories of bankruptcy matters, namely; "cases under title 11," over which the district court has original and exclusive jurisdiction and "proceedings arising under title 11, or arising in or related to cases under title 11," over which the district court has original, but not exclusive

jurisdiction. 28 U.S.C. §1334(a) & (b). See Middlesex Power Equip. & Marine v. Town of Tyngsborough, Mass. (In re Middlesex Power Equip. & Marine, Inc.), 292 F. 3d 61, 66 (1st Cir. 2002); Gupta v. Quincy Med. Ctr., 858 F. 3d 657, 661 (1st Cir. 2017). "'Cases'" under title 11 are to be distinguished from civil proceedings arising under title 11 or civil proceedings related to or arising in title 11 cases. The introductory phrase of section 1334(a), 'Except as provided in subsection (b) of this section', introduces the concept that the jurisdiction of the district courts over title 11 'cases' is original and exclusive, while the jurisdiction over civil proceedings arising under title 11, or arising in title 11 cases, or related to those cases, is original but not exclusive." Alan N. Resnik & Henry J. Sommer, 1 Collier on Bankruptcy, ¶3.01[2] (16th ed. 2021).

28 U.S.C. §157(a) provides that, "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." "This broad jurisdictional grant allows the bankruptcy courts to 'deal efficiently and expeditiously with all matters connected with the bankruptcy estate.'" Celotex Corp. v. Edwards, 514 U.S. at 308 (citing Pacor, Inc. v. Higgins, 743 F. 2d 984, 994 (3rd Cir. 1984)). The demarcations between these types of proceedings are not always easy to distinguish from each other. See In re Middlesex Power Equip. & Marine, Inc., 292 F. 3d at 68 ("[t]he dividing line is unclear between proceedings that 'arise under' as opposed to 'arise in' and as opposed to 'related to' title 11. The statute itself provides no definitions."). See also; Wood v. Wood (In re Wood), 825 F. 2d 90, 96 (5th Cir. 1987); Tamko Roofing Prods., Inc. v. Ideal Roofing Co., 282 F. 3d 23, 32 (1st Cir. 2002). "Section 157 also divides bankruptcy proceedings into two further categories: "core" and "non-core." Stern v. Marshall, 564 U.S. 462, 473-76, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). These categories determine '[t]he manner in which a bankruptcy judge may act on a referred matter." Id. at 473. Proceedings 'arising under title 11, or arising in a case under title 11,' are both considered 'core proceedings' in which the bankruptcy court may enter final orders and judgments. Id. at 474 (citing 28 U.S.C. § 157(b)). Proceedings merely 'related to' a case under title 11 are considered 'non-core' proceedings. Stern, 564 U.S. at 477 (citing Collier on Bankruptcy ¶ 3.02[2], p. 3-26, n.5 (16th ed. 2010) ('The terms 'non-core' and 'related' are synonymous.'). Although whether a bankruptcy proceeding is a core proceeding is analytically separate from whether there is jurisdiction, 'by definition all core proceedings are within the bankruptcy court's jurisdiction.' Continental Nat'l Bank v. Sanchez (In re Toledo), 170 F.3d 1340, 1345 n.6 (11th Cir. 1999) (citing 28 U.S.C. §§ 157(b)(1), 1334(b))." Gupta v. Quincy Med. Ctr., 858 F. 3d. at 662, fn 5; See also, Roy v. Canadian Pac. Ry. Co. (In re Lac-Mégantic Train Derailment Litig.), 999 F.3d 72, 79, fn. 4 (1st Cir. 2021).

Bankruptcy proceedings "arising under" title 11 are those in which the Bankruptcy Code itself creates a statutory cause of action. Gupta v. Quincy Med. Ctr., 858 F. 3d at 662 (citing Stoe v. Flaherty, 436 F. 3d 209, 217 (3rd Cir. 2006)(noting that 'arising under' jurisdiction is limited to proceedings where "the Bankruptcy Code creates the cause of action or provides the substantive right invoked"); In re Wood, 825 F. 2d at 96 ("Congress used the phrase 'arising under title 11' to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11.")). "Courts have held that civil proceedings "arising under title 11" include causes of action to recover fraudulent transfers, avoidance actions brought under section 544(b) of the Bankruptcy Code, actions to recover

-33-

postpetition transfers under section 549 and actions against general partners under section 723." Alan N. Resnik & Henry J. Sommer, 1 Collier on Bankruptcy, ¶3.01[3][e][i] (16th ed. 2021). Other civil proceedings that arise particularly under title 11 and are classified as administrative matters or contested matters under Fed. R. Bankr. P. 9014 include the following controversies: "...whether to appoint or elect a trustee under chapter 11, motions to obtain financing with priority over existing liens, confirmation of a plan under chapters 9, 11, 12 or 13, sales free and clear of liens, complaints objecting to the discharge of a debtor and the payment of post confirmation fees to the United States trustee in chapter 11 cases." Id. at ¶3.01[3][e][i].

Proceedings "arising in" cases under title 11 are "those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." In re Middlesex Power Equip. & Marine, Inc., 292 F.3d at 68; see also; Gupta v. Quincy Med. Ctr., 858 F. 3d at 663 (citing Stoe v. Flaherty, 436 F. 3d at 218 ("[C]laims that 'arise in' a bankruptcy case are claims that by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case."); Continental Nat'l Bank v. Sanchez (In re Toledo), 170 F.3d 1340, 1345 (11th Cir. 1999) (stating that proceedings "arising in" bankruptcy are "matters that could arise only in bankruptcy")). "There is no 'but for' test for arising in jurisdiction; that is, the fact that a matter would not have arisen had there not been a bankruptcy case does not *ipso facto* mean that the proceeding qualifies as an "arising in" proceeding." Id. at ¶3.01[3][e][iv].

"'Arising in' acts as the residual category of civil proceedings, and includes such things as administrative matters, "orders to turn over property of the estate" and "determinations of the validity, extent, or priority of liens." 'Arising in' proceedings might also include contempt matters, motions to appoint an additional committee under section 1102, and motions to appoint or elect trustees or appoint examiners under section 1104. An action to recover a postpetition account 'arises in the bankruptcy case,' as does an action challenging certain activities connected with an auction of estate property, and an action for legal malpractice that arose postpetition, even one that belongs to the debtor and not to the estate." Id. at ¶3.01[3][e][iv].

"This category is also illustrated by such things as allowance and disallowance of claims, orders in respect of obtaining credit, determining the dischargeability of debts, discharges, confirmation of plans and like matters. In none of these instances is there a "cause of action" created by statute, nor could any of the matters illustrated have been the subject of a lawsuit absent the filing of a bankruptcy case." Id. at ¶3.01[3][e][iv].

"By far the largest number of reported cases dealing with bankruptcy jurisdiction over civil proceedings are concerned with whether a particular proceeding is "related to" a title 11 case. These cases are of two kinds. The first concerns whether, at one extreme, although a particular civil proceeding is definitely within bankruptcy jurisdiction, it is "core" or "related"; the second concerns whether, at the other extreme, a civil proceeding is "related" or is not within the bankruptcy jurisdiction granted by section 1334(b) at all." Id. at ¶3.01[3][e][ii].

This court in <u>Martinez Arzuaga v. Quantum, Servicing Corp.</u> (<u>In re Martinez Arzuaga</u>), 2012 Bankr. LEXIS 1443 at *12-13, 2012 WL 1120673 at *5 (Bankr. D.P.R. 2012) analyzed whether a bankruptcy court had jurisdiction to adjudicate and FDCPA claim under the "related to" a title case and its analysis was the following:

"[w]hether the claims are sufficiently "related to" a bankruptcy case is a question of whether they are "sufficiently connected" to the debtor's reorganization. The Third Circuit has established a much-cited standard for determining whether a proceeding is "related." <u>In Pacor, Inc. v. Higgins</u>, 743 F.2d 984 (3rd Cir. 1984), the court described the test as whether "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." The First Circuit has recognized this standard. See <u>In re G.S.F. Corp.</u>, 938 F.2d 1467, 1475 (1st Cir. 1991). In addition, numerous First Circuit, district and bankruptcy courts have accepted and applied this test. See, e.g., <u>In re Santa Clara County Child Care Consortium</u>, 223 B.R. 40, 45 (B.A.P. 1st Cir. 1998) [*13] (providing a lengthy list of First Circuit district and bankruptcy courts adopting the Pacor test). Simply stated, if the determination of the controversy could have an effect on the bankruptcy estate, the controversy is a "related matter." 28 U.S.C.A. § 157(a).

See also <u>In re Roman-Perez</u>, 527 B.R. at 852-854; <u>Torres Melendez v. Collazo Connelly & Surillo, LLC</u> (<u>In re Torres Melendez</u>), 2020 Bankr. LEXIS 297, at *4-5 (Bankr. D.P.R. Feb. 3, 2020).

"Hence, an action is 'related to' bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate." <u>In Pacor, Inc. v. Higgins</u>, 743 F.2d at 994.

"Civil proceedings encompassed by section 1334(b)'s "related proceedings," that is, those whose outcome could conceivably have an effect on the bankruptcy estate fall into two main categories: (1) those that involve causes of action owned by the debtor that became property of a title 11 estate under section 541 (as distinguished from postpetition causes of action, i.e., those that come into existence during the pendency of the bankruptcy case); and (2) those that are suits between third parties that "in the absence of bankruptcy, could have been brought in a district court or a state court." Alan N. Resnik & Henry J. Sommer, 1 <u>Collier on Bankruptcy</u>, ¶3.01[3][e][i] (16th ed. 2021).

<u>Irizarry v. Irizarry</u> (<u>In re Betteroads Asphalt, LLC</u>), 2021 Bankr. LEXIS 3081, at *31-38 (Bankr. D.P.R. Nov. 8, 2021)

In the instant adversary proceeding the Plaintiffs' claims must "arise under," "arise in," or "relate to" a cause under title 11 to fall within section 1334's jurisdictional scope. The Plaintiffs in the Complaint contended that this Court had jurisdiction based on the following:

-35-

"[t]his Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§1334 and 157(a) and the General Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of Puerto Rico dated July 19, 1984 (Torruella, C.J.). This is a core proceeding in accordance with 28 U.S.C. §157(b).

This Court has jurisdiction over Debtors' claims for Defendant BPPR's violations to RESPA pursuant to 12 U.S.C. § 2614 and 28 U.S.C. § 1331. Furthermore, various Courts have found that Federal Bankruptcy Courts have jurisdiction to hear RESPA claims so long as the claim has an impact on the bankruptcy estate. See In re Thompson, 350 B.R. 842 (Bankr. E.D. Wis. 2006) and In re Tomasevic, 279 B.R. 358 (Bankr. M.D. Fla. 2002). This Court also has supplemental jurisdiction over the FDCPA, FCRA, and state law claims of debtor under this Court's power to hear claims "related to" Title 11. See In re Sasson, 424 F.3d 864 (9th Cir. 2005); In re Hospitality Ventures/LaVista, 358 B.R. 462 (Bankr. N.D. Ga. 2007) (test to determine whether proceeding is "related to" bankruptcy case is whether outcome of case could conceivably affect estate involved in the bankruptcy). The Bankruptcy Court for the District of Puerto Rico has venue for this matter under Title 28 U.S.C. §1409." (Docket No. 1, pgs. 2-3).

The Debtors in their Amended Chapter 13 Plan dated August 2, 2018, which was confirmed on September 5, 2018, disclosed the following in Section 8.1(3) of the Plan: "DISPOSABLE INCOME: Any proceeds from adversary complaint against BPPR will be devoted into the plan." Section 8.1(5) of the Plan disclosed the following: "PROCEEDS OF DEBTOR'S CLAIM AGAINST BPPR: Debtor will pay into the plan all non-exempt proceeds [f]rom his claim against Banco Popular de Puerto Rico disclosed in schedule A/B, if said proceeds are received during the life of the plan." Section 8.1(6) of the Plan disclosed the following: "DISBURSEMENTS TO GENERAL UNSECURED CREDITORS: General unsecured creditors will be paid 100% plus 6% interest." (Lead Bankruptcy Case 17-07489, Docket Nos. 26 & 31). Thereafter, the Debtors filed a Post Confirmation Modification Chapter 13 Plan of Reorganization dated October 25, 2018, to shorten the time of the plan to forty-five (45) months and the same was confirmed on December 10, 2018. Sections 8.1(3), 8.1(5) and 8.1(6) of the confirmed post confirmation modification plan read in the same manner as the first amended chapter 13 plan (Lead Bankruptcy Case 17-07489, Docket Nos. 33 & 35).  On March 4, 2021, the Debtors filed a Post Confirmation Modification

Chapter 13 Plan (Lead Bankruptcy Case, Docket No. 50). Subsequently, on April 29, 2021, the Debtors filed another Post Confirmation Modification of Chapter 13 Plan and the same was granted on May 24, 2021 (Lead Bankruptcy Case 17-07489, Docket Nos. 67 & 78). On June 7, 2021, the Debtors filed another Post Confirmation Modification of Chapter 13 Plan by which they wanted to amend the following: (i) part 2.1 to modify the period of the plan and shorten the same to forty (40) periods; (ii) part 2.4 to inform additional lumpsum payment in the amount of $13,167.79 paid in May 2021 to Chapter 13 Trustee and the source of the same was inheritance funds of Debtor; and (iii) part 4.3 to modify attorney's fees  (Lead Bankruptcy Case 17-07489, Docket No. 81). The same was granted on July 21, 2021 (Lead Bankruptcy Case 17-07489, Docket No. 89). On August 6, 2021, the Chapter 13 Trustee filed an *Informative Motion* disclosing that the Debtors have completed the plan payments under the approved post confirmation plan and that after having made all the disbursements under the approved plan, the trustee has a surplus of $436.01 which will be returned to the Debtors. (Lead Bankruptcy Case 17-07489, Docket No. 91).

The Plaintiffs filed the withdrawal of reference to the United States District Court for the District of Puerto Rico on May 21, 2021 (Docket No. 100). On May 27, 2021, the Court entered an *Order of Referral to the U.S. District Court of Puerto Rico the Plaintiffs' Motion to Withdraw the Reference to the U.S. District for the District of Puerto Rico* (Docket No. 104). On August 30, 2021, the Chapter 13 Trustee filed his *Final Report and Account* of administration of the estate pursuant to 11 U.S.C.  §1302(b)(1). (Lead Bankruptcy Case 17-07489, Docket No. 94) Also, on August 30, 2021, the Order granting the Debtors' bankruptcy discharge was entered. Thereafter, on January 4, 2022, the District Court rendered its Opinion and Order denying the withdrawal of reference. The January 4, 2022, *Opinion and Order* was docketed on February 1, 2022, on the Bankruptcy Court's docket. The Opinion and Order does not address the Debtors completion of plan payments and the Debtors' August 30, 2021, bankruptcy discharge.

This adversary proceeding centers upon alleged federal violations of RESPA, Regulation X, HAMP, TILA, and state law claims under the PR civil code that arose pre-petition. It is undisputed that none of these causes of action "arise under" title 11 because they do not arise under a statutory cause of action created or determined by a statutory provision of the Bankruptcy Code. Moreover, this Court finds that the causes of actions in this proceeding do not fall under the "arise in" category because these pre-petition federal and state law claims exist outside of the bankruptcy and thus, could have been the subject of a lawsuit absent a bankruptcy case. The Plaintiffs were aware of this, given that they filed a withdrawal of reference to United States District Court of Puerto Rico because the adversary complaint is "overwhelmed" by non-bankruptcy law. (Docket No. 142, pg. 7).

Lastly, the Plaintiffs in the Complaint filed on February 4, 2019, disclosed that this Court has "related to" subject matter jurisdiction in this adversary proceeding because "…various Courts have found that Federal Bankruptcy Courts have jurisdiction to hear RESPA claims so long as the claim has an impact on the bankruptcy estate." (Docket No. 1, pg. 3). The court finds that this adversary proceeding centers upon alleged federal violations of RESPA, Regulation X, HAMP, TILA and state common law claims pursuant to the PR Civil Code which fall in the "related to" category that involves causes of actions that in the absence of bankruptcy, could have been brought in a district court or state court. If the Debtors are successful the court may award damages, but such recovery would not have an impact on the bankruptcy estate, given that the same would not be available for distribution to creditors or an increased distribution to creditors. Therefore, the instant adversary proceeding could not conceivably have an effect on the Debtors' "rights, liabilities, options, or freedom of action' in any manner that would impact the handling and administration of the bankruptcy estate. Thus, the bankruptcy court does not have subject matter

-38-

jurisdiction. See also; Patrick v. CitiMortgage, Inc. (In re Patrick), 2014 Bankr. LEXIS 5115, at *9 (Bankr. N.D. Ohio Dec. 22, 2014).

Conclusion

In view of the foregoing, the Court concludes that it does not have subject matter jurisdiction over the causes of action in the Complaint, as filed, or in the proposed Amended Complaint, without prejudice to presenting the same an appropriate forum. Therefore, Judgment will be entered dismissing the present adversary proceeding.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 22nd day of July 2022.

Enrique S. Lamoutte
United States Bankruptcy Judge